792 S.E.2d 920

**Tzvetelina MITEVA, Appellant,**

v.

**Nicholas ROBINSON, Respondent.**

**Appellate Case No. 2014–002484**

Opinion No. 5450
Rehearing Denied January 20, 2017
Court of Appeals of South Carolina.

Heard June 16, 2016
Filed November 2, 2016

448

450

John S. Nichols, of Bluestein Nichols Thompson & Delgado, LLC, of Columbia, for Appellant.

Thomas Franklin McDow, IV and Erin K. Urquhart, of McDow and Urquhart, LLC, and Jennifer M. Creech, of the Law Office of Jennifer M. Creech, LLC, all of Rock Hill, for Respondent.

WILLIAMS, J.:

Tzvetelina Miteva (Wife) appeals the family court's divorce decree, arguing the family court erred in: (1) denying her request for a divorce on the ground of Nicholas Robinson's (Husband) habitual drunkenness; (2) identifying and apportioning the marital estate on a fifty-fifty basis; and (3) requiring her to pay Husband's attorney's fees. We affirm as modified.

## FACTS

Wife and Husband married on November 25, 2007. After almost four years of marriage, Wife filed for divorce on August 30, 2011. The parties had no children during the marriage, but Wife had a minor child and Husband had two

adult children from their respective prior marriages. In Wife's complaint, she sought a divorce on the ground of Husband's habitual drunkenness and requested equitable division of the marital assets and attorney's fees. Husband answered and counterclaimed, denying Wife's allegations and seeking equitable division of the marital estate and attorney's fees.

The family court held a final hearing on May 8 and 9, 2013. At the final hearing, Husband and Wife submitted evidence and testimony to substantiate their claims to the family court, specifically addressing each party's claim to several properties that were bought, improved, and sold during their marriage. The family court subsequently issued its final order and denied Wife a divorce on the ground of habitual drunkenness. Because Wife failed to prove by a preponderance of the evidence that she was entitled to a divorce on this ground, the family court granted both parties a divorce on the ground of one-year's separation.

The family court also held the following: (1) the parties transmuted certain properties that were bought and sold during the marriage; (2) Husband's retirement account and mobile homes were nonmarital property; and (3) the family court did not have jurisdiction to divide real property that was not titled in the name of either party. The family court concluded Wife's removal of $115,521 from marital funds was financial misconduct and assigned that amount to Wife. After considering the factors for apportioning marital property as required by section 20–3–620(B) of the South Carolina Code (2014), the family court apportioned 50% of the marital estate to Wife and 50% to Husband. Finally, the family court required Wife to pay all of Husband's attorney's fees, which totaled $27,561.29. Wife submitted a motion to alter or amend the family court's ruling, which the family court denied. This appeal followed.

**STANDARD OF REVIEW**

 "In appeals from the family court, this [c]ourt reviews factual and legal issues de novo." *Simmons v. Simmons*, 392 S.C. 412, 414, 709 S.E.2d 666, 667 (2011). "[T]his [c]ourt has jurisdiction to find facts in accordance with its view of the preponderance of the evidence." *Epperly v. Epperly*, 312 S.C. 411, 414, 440 S.E.2d 884, 885 (1994). Although the appellate

court retains the authority to make its own findings of fact, "we recognize the superior position of the family court . . . in making credibility determinations." *Lewis v. Lewis*, 392 S.C. 381, 392, 709 S.E.2d 650, 655 (2011). Therefore, the appellant bears the burden of convincing this court that the family court committed error or the preponderance of evidence is against the court's findings. *Id.*

## I. HABITUAL DRUNKENNESS

█ Wife argues the family court erred in denying her request for a divorce on the ground of habitual drunkenness. We disagree.

█ "Section 20–3–10(4) of the South Carolina Code . . . provides that habitual drunkenness is grounds for divorce. Habitual drunkenness is the fixed habit of frequently getting drunk; it does not necessarily imply continual drunkenness." *Lee v. Lee*, 282 S.C. 76, 78–79, 316 S.E.2d 435, 437 (Ct. App. 1984). "In order to prove habitual drunkenness, there must be a showing that the abuse of alcohol caused the breakdown of the marriage and that such abuse existed at or near the time of filing for divorce." *Epperly*, 312 S.C. at 414, 440 S.E.2d at 885.

Wife testified Husband was unemployed for half of the marriage. Moreover, Wife claimed, while Husband was unemployed, he would get drunk every day and abuse prescription medication. Wife testified Husband's alcohol consumption and drug use worsened throughout the marriage and caused the marriage to deteriorate.

Wife introduced four police reports to support her testimony. A police report dated April 17, 2010, indicated Wife called police but reported everything was "10–4." On December 5, 2010, Wife again called police and said "Husband ha[d] gone crazy," but she then stated she did not need help. On April 9, 2011, police responded to a call from Wife, but when they arrived, Wife claimed she was fine and would not provide a reason for calling. At the hearing, Wife stated Husband hid in the basement and instructed her to tell police everything was okay. In the final police report, dated October 21, 2012, Wife reported Husband walked around their house naked in front of her daughter. However, on cross-examination, Wife ac-

knowledged she separated from Husband in 2011, but she waited until October 2012 to file the final police report. Wife claimed she did not know the process for making an allegation, but she then conceded she had contacted police on prior occasions. Additionally, Wife admitted that, on April 30, 2009, she wrote a note indicating if something happened to her, she would like her daughter to stay with Husband.

Zlatka Miteva, Wife's mother, testified she lived in Bulgaria, but stayed with the parties for a few months every year. She stated Husband had a problem with alcohol before the parties married. Zlatka claimed Husband got drunk every day and took prescription medication, which caused him to shake and become aggressive.

Several other witnesses testified regarding Husband's alcohol consumption. Husband's ex-wife, Nasrin Robinson, and one of Husband's daughters, Sophie Robinson, testified they had observed Husband consume alcohol, but they had never seen him drunk. Additionally, both claimed they had never seen Husband become angry when drinking. Nasrin admitted she only saw Husband several times a year. Nasrin and Sophie both acknowledged Husband paid for Sophie's undergraduate and graduate school tuition. Don Pierman, Husband's friend, testified he had known Husband for twenty-five years, but he had never seen him drunk. However, Pierman admitted he had only seen Husband once a year during the past few years.

Husband also testified at the final hearing about his alcohol consumption. Husband admitted he drank alcohol but denied drinking in excess or using drugs. Moreover, Husband asserted he was not intoxicated when police came to the parties' home. Husband testified he was employed as a system auditor when the parties married, and he sometimes worked from home during the marriage. He claimed he was laid off because of a change in management. According to Husband, Wife's daughter saw him naked once when walking from his bedroom to his bathroom; however, he stated he was not expecting to see her.

After considering the foregoing testimony, the family court concluded Wife failed to prove by a preponderance of the evidence that she was entitled to a divorce on the ground of Husband's habitual drunkenness. The family court stated Nas-

rin and Sophie might not be disinterested witnesses because of Husband's support obligations but found Pierman's testimony should be given more weight. Additionally, the family court found Husband's appearance and professional accomplishments suggested he was a person of considerable self-control. The family court noted there was no mention of alcohol in any of the police reports and determined the incident report regarding nudity in the presence of Wife's daughter was generated after the separation to create corroboration for the grounds for divorce when no other significant corroboration existed. Furthermore, the family court ascertained Wife's letter, stating she wished for her daughter to stay with Husband, was written half-way through the marriage and occurred during Husband's unemployment when, according to Wife and Zlatka, Husband's drinking was the most evident.

Aware of our de novo standard of review, we concur with the family court's decision on this issue. Because the parties presented conflicting evidence about the nature of Husband's drinking, we find the family court was in the best position to determine the credibility of the witnesses. *See Bodkin v. Bodkin,* 388 S.C. 203, 214, 694 S.E.2d 230, 236 (Ct. App. 2010) (affirming the family court's finding that husband failed to establish wife's habitual drunkenness when parties presented conflicting evidence as to how much wife drank and whether it was a problem because "the family court was in the better position to see the witnesses and judge their credibility"). The family court found Pierman's testimony that Husband did not drink in excess was credible. Similarly, it found Husband's appearance and professional accomplishments were indicative of self-control. Based upon these findings as well as the fact that none of the police reports mentioned alcohol, we affirm the family court's finding that Wife did not meet her burden of proof. Furthermore, because the granting of a divorce to Wife on the ground of habitual drunkenness would not have dissolved the marriage any more completely, we find Wife suffered no prejudice by the family court's ruling. *See Mick–Skaggs v. Skaggs,* 411 S.C. 94, 101–02, 766 S.E.2d 870, 873–74 (Ct. App. 2014) (finding the family court acted within its discretion in awarding parties a no-fault divorce, even though wife presented sufficient evidence to establish a fault-based

ground for divorce). Thus, we affirm the family court's decision on this issue.

## II. IDENTIFICATION AND APPORTIONMENT OF THE MARITAL ESTATE

Wife argues the family court erred in its identification and apportionment of the marital estate. We disagree.

### A. Identification of the Marital Estate

■■■■ Marital property consists of "all real and personal property which has been acquired by the parties during the marriage and which is owned as of the date of filing or commencement of marital litigation as provided in [s]ection 20–3–620 regardless of how legal title is held. . . ." S.C. Code Ann. § 20–3–630(A) (2014). Property acquired prior to the marriage and property acquired by inheritance, devise, bequest, or gift from a party other than the spouse is nonmarital property. *Id.* "The [family] court does not have jurisdiction or authority to apportion nonmarital property." S.C. Code Ann. § 20–3–630(B) (2014).

> Property that is nonmarital when acquired may be transmuted into marital property if it becomes so commingled with marital property that it is no longer traceable, is titled jointly, or is used by the parties in support of the marriage or in some other way that establishes the parties' intent to make it marital property.

*Wilburn v. Wilburn*, 403 S.C. 372, 384, 743 S.E.2d 734, 740 (2013). "The spouse claiming transmutation must produce objective evidence showing that, during the marriage, the parties themselves regarded the property as the common property of the marriage." *Jenkins v. Jenkins*, 345 S.C. 88, 98, 545 S.E.2d 531, 537 (Ct. App. 2001). "As a general rule, transmutation is a matter of intent to be gleaned from the facts of each case." *Johnson v. Johnson*, 296 S.C. 289, 295, 372 S.E.2d 107, 110 (Ct. App. 1988).

### 1. Mobile Homes

■■■■ Wife first contends the family court erred in classifying several mobile homes as nonmarital property. We disagree.

In support of her position, Wife claimed she gave Husband $50,000 in cash and $52,500 in checks to pay off credit card debt he incurred prior to the marriage when he purchased several mobile homes. However, when questioned, Wife acknowledged the checks paid to Husband during the marriage only totaled $21,000. Conversely, Husband asserted he purchased the mobile homes in 2006 with money from stocks and did not have any outstanding credit card debt when the parties married. The family court determined the mobile homes were purchased by Husband prior to the marriage with cash from the sale of stock, and there was no indication that Husband intended to transmute them into marital property. The family court noted Wife did not provide credit card statements or payments made directly to pay off credit cards to support her allegation.

We agree with the family court and find Wife failed to prove the parties intended to transmute the mobile homes into marital property. After reviewing the record, we conclude Wife did not present any evidence specifically proving she paid off Husband's credit card debt associated with the mobile homes and did not prove the parties regarded the mobile homes as common properties of the marriage. *See Jenkins*, 345 S.C. at 98, 545 S.E.2d at 537 ("The spouse claiming transmutation must produce objective evidence showing that, during the marriage, the parties themselves regarded the property as the common property of the marriage."); *see also Murray v. Murray*, 312 S.C. 154, 158, 439 S.E.2d 312, 315 (Ct. App. 1993) (finding wife failed to produce objective evidence showing that real estate purchased by husband prior to the marriage was regarded by the parties as common property during the marriage). Accordingly, we affirm the family court's decision on this issue.

## 2. Ferguson Meadow and Montibello Drive

 Wife also claims the family court erred in concluding Ferguson Meadow and Montibello Drive were marital properties. We disagree.

Wife stated she purchased all the properties that were bought and sold during the marriage with money she received from her family in Bulgaria and $200,000 Husband repaid her by taking out a home equity line of credit (HELOC). Wife

asserted she loaned Husband over $200,000 during the marriage to pay off his credit card debt; to pay the mortgage on the home he purchased before the parties' marriage; and to fulfill obligations he owed from his previous separation agreement. Wife claimed she initially purchased a home on Ferguson Meadow in York, South Carolina (Ferguson Meadow), and another property located in Rock Hill, South Carolina. Wife stated she sold the property located in Rock Hill and used the proceeds to remodel another property she purchased in Lake Wylie, South Carolina, which she subsequently sold. Wife claimed she continued to buy and sell various properties in South Carolina and North Carolina using proceeds from prior sales, including a home on Montibello Drive in Charlotte, North Carolina (Montibello Drive).

According to Wife, Husband had no involvement with the purchased properties; however, she conceded: (1) Husband's name was listed as the purchaser on the Lake Wylie property settlement statement; (2) Husband and Wife's names were listed as the purchasers on the settlement statement of Ferguson Meadow; and (3) Husband's name was listed as the landlord on the lease for Ferguson Meadow. When Husband emailed Wife to inquire about the location of the HELOC money, Wife acknowledged responding that "the $200K [was] in Montibell[o]."

William Brice—the closing attorney for four of the properties—testified Wife told him the money for the properties came from her family and specified the properties were investments for her daughter. Brice said most of the properties were purchased in Wife's name, but one might have been titled in Husband's name.

Conversely, Husband testified he and Wife began jointly investing in real estate for their mutual benefit. Husband claimed Nadejda and Pavel Bolt worked with the parties to buy, renovate, and resell the acquired properties. In this venture, Husband stated he researched properties; Nadejda acted as their real estate agent; he and Wife financed the purchases; and then he and Pavel renovated the properties. Husband introduced emails to substantiate their professional relationship. Husband also introduced his email correspon-

dence with York County Planning and Development Services regarding property inspections and permits.

Husband claimed he found the first property, and Wife financed the purchase price. He testified he had the first property painted; installed a refrigerator, microwave, and range; and "[brought] it up to spec[ ]." Husband also stated he found a tenant and managed the first property before it was sold. According to Husband, he then found Ferguson Meadow, and Wife also financed this purchase price. Husband explained he rented and managed Ferguson Meadow, and in support of his claim, he introduced a lease on which he was listed as the landlord. Husband testified he then found the Lake Wylie property and financed the $216,000 purchase price by taking out a HELOC. Husband claimed he and Pavel performed extensive remodeling before selling this property. He recalled Nadejda found the next property in Fort Mill. According to Husband, the parties sold the Fort Mill property, and the proceeds went to purchase another property in Waxhaw, North Carolina. Husband admitted he did not perform any physical labor on the Waxhaw property. The parties used the proceeds of the Waxhaw property to purchase Montibello Drive, which Wife managed and rented before residing there.

The family court found Ferguson Meadow was transmuted into marital property because it was purchased by the parties in the joint enterprise of buying and selling distressed properties. Additionally, the family court concluded Montibello Drive was marital property because it was financed with the proceeds generated from a number of real estate sales by Husband and Wife and by Husband's HELOC.

We agree that Montibello Drive was marital property and Ferguson Meadow was transmuted into marital property. Along with Husband's testimony that he and Wife jointly invested in real estate for their mutual benefit, Husband also introduced the following: (1) emails sent between him and York County Planning and Development Services regarding housing inspections and permits; (2) emails demonstrating a work relationship between Husband, Wife, Pavel, and Nadejda; and (3) a Ferguson Meadow lease with Husband's name listed as the landlord. Husband also introduced multiple emails demanding Wife tell him the location of the money

from his HELOC, and Wife's response that "the 200K are in Montibello." We find Husband's persistent inquiries and Wife's response tend to establish that the HELOC was not meant to repay Wife, but was a source of capital for the parties' real estate investments. Although the parties agree that Wife financed Ferguson Meadow, we find Husband put forth evidence that he and Wife regarded the purchased real estate as common property of the marriage. *See Jenkins*, 345 S.C. at 98, 545 S.E.2d at 537 ("The spouse claiming transmutation must produce objective evidence showing that, during the marriage, the parties themselves regarded the property as the common property of the marriage."). Accordingly, we affirm the family court's finding that Ferguson Meadow and Montibello Drive were marital property.

## B. Apportionment of the Marital Estate

Next, Wife asserts the family court failed to consider the evidence and appropriately apply the equitable apportionment factors when it divided the marital estate. Specifically, Wife asserts: (1) she contributed significantly more to the acquisition of property; (2) Husband's income was higher; (3) she did not commit financial misconduct; (4) Husband received significant nonmarital property; (5) Husband had a vested retirement account while Wife had none; and (6) the parties were not awarded homes of equal value. We disagree.

"The apportionment of marital property is within the discretion of the family court and will not be disturbed on appeal absent an abuse of discretion." *Wooten v. Wooten*, 364 S.C. 532, 542, 615 S.E.2d 98, 103 (2005). Section 20–3–620(B) of the South Carolina Code (2014) provides fifteen factors the family court must consider in apportioning marital property and affords the family court the discretion to weigh each factor as it finds appropriate. "On appeal, this court looks to the overall fairness of the apportionment, and it is irrelevant that this court might have weighed specific factors differently than the family court." *Doe v. Doe*, 370 S.C. 206, 213–14, 634 S.E.2d 51, 55 (Ct. App. 2006).

Wife testified at the hearing regarding the parties' assets at the time of the marriage. She indicated she had $38,230.76 in the bank; $50,000 or $60,000 in cash from family in Bulgaria;

and additional money wired from her mother in Bulgaria. Wife testified Husband did not have any liquid assets, but he owned a house on Messina Road in Clover, South Carolina (Messina Road), which had a mortgage of over $200,000. Additionally, Wife contended Husband was unemployed for half of the marriage, and she paid Messina Road's mortgage when he was unemployed.

According to Wife, over the course of the parties' marriage, she gave Husband over $200,000. She stated she regularly received money from her family in Bulgaria, claiming she received around $50,000 prior to the marriage and over $200,000 during the marriage. According to Wife, the funds came from her parents, rental income from Wife's investment properties, and her daughter's father. Wife claimed family and friends visiting from Bulgaria would bring money into the United States in $10,000 increments. She stated she expected Husband to repay her the money she gave him during their marriage, but she could not provide the exact amount of money he owed her. Wife also admitted that when she responded to an interrogatory asking her to list any loans, gifts, advances, or subsidies from family members that she had received in the past five years, she only listed $57,000. Zlatka also testified she gave Wife around $230,000 during the marriage.

Wife claimed she invested over $100,000 in a solar panel company in June 2011, but she lost the money because the business was unsuccessful. She stated one of the partners in the solar panel company previously performed work on Montibello Drive. According to Wife, the partner in the solar panel company forgave $50,000 or $60,000 that was owed to him for his work on Montibello Drive after she lost her investment.

Husband claimed he and Wife kept their finances separate because they had preexisting properties and obligations. He testified Wife never paid Messina Road's mortgage. Husband stated he was terminated from his job in January 2009 because of a change in management, and he received $1,200 per month in unemployment benefits for the next fourteen months. During this time, he became an independent consultant and also began researching the real estate market. According to Husband, he used savings and rental income from

his mobile homes to financially support his daughter and pay Messina Road's mortgage, taxes, and utilities.

In response to Wife's claim that she invested $100,000 in a solar panel company in June 2011, Husband testified he believed Wife withdrew $115,000 and gave the money to Pavel to purchase a home on Caldwell Rush Circle in Cornelius, North Carolina (Caldwell Rush) under the trade name, Power-hightech. He stated Wife told him about another property prior to June 2011, and he expressed concerns about whether the investment would be profitable. Husband introduced a deed dated June 22, 2011, indicating: (1) Powerhightech was the purchaser of Caldwell Rush; (2) Pavel signed the deed as President of Powerhightech, Inc.; and (3) the purchase price was $114,486. He stated Wife began excluding him from transactions and decision-making, and he introduced emails he sent to Wife, Nadejda, and Pavel expressing his frustration and asking where his HELOC money was located. Husband claimed he had not seen any of the proceeds from the properties.

The family court noted that as of the final hearing, Husband's gross monthly income was $15,450 and Wife's gross monthly income was $11,000. After receiving the foregoing evidence and testimony, the family court considered all the applicable factors provided in section 20-3-620(B) and determined the marital property should be divided evenly between Wife and Husband.

After reviewing the record, we find the family court's apportionment was fair, and it did not abuse its discretion by apportioning 50% of the marital estate to Wife and 50% to Husband. *See Wooten,* 364 S.C. at 542, 615 S.E.2d at 103 ("The apportionment of marital property is within the discretion of the family court and will not be disturbed on appeal absent an abuse of discretion."). In response to Wife's allegation of error, we find Wife failed to provide satisfactory evidence that she contributed $200,000 of her own funds toward the acquisition of marital property. Wife did not present any bank statements to verify the source of her funds, with the exception of two withdrawals of $56,149 and $55,342, which were used to purchase the parties' two initial properties. Because we concur with the family court's finding that these two properties were

transmuted into marital property, we find the funds used to purchase those properties also to be marital. Additionally, we find the family court's conclusion that Wife was in a better financial position than Husband was not an abuse of discretion. Although Husband's income was higher than Wife's on the date of the final hearing, we concur with the family court's finding that Wife had no debt, possessed significant nonmarital properties, and had more time before retirement to acquire assets.

As to the family court's finding that Wife committed marital misconduct regarding the parties' finances, we, too, question whether Wife invested $115,000—almost the exact amount invested to acquire Caldwell Rush—in a solar panel company owned by the same person who worked for her flipping properties. We hold the family court thoroughly considered the parties' nonmarital assets, including Husband's 401K retirement account, and available evidence on the income from the parties' nonmarital properties. Finally, as to Wife's argument that the houses awarded to each party were not of equal value, we find the family court's equitable apportionment worksheet accounted for the differing home values in its fifty-fifty division of the marital assets. Therefore, we find the fifty-fifty division as a whole was fair. *Doe*, 370 S.C. at 213–14, 634 S.E.2d at 55 ("On appeal, this court looks to the overall fairness of the apportionment, and it is irrelevant that this court might have weighed specific factors differently than the family court."). Accordingly, we affirm the family court's decision on this issue.

### III. ATTORNEY'S FEES

 Last, Wife argues the family court erred in requiring her to pay all of Husband's attorney's fees. We agree and accordingly modify the family court's order.

 "The award of attorney's fees in a domestic action rests within the sound discretion of the family court." *Reiss v. Reiss*, 392 S.C. 198, 210, 708 S.E.2d 799, 805 (Ct. App. 2011). When deciding whether to award attorney's fees, the family court must consider: "(1) the party's ability to pay his/her own attorney's fee; (2) beneficial results obtained by the attorney; (3) the parties' respective financial conditions; [and] (4) [the]

effect of the attorney's fee on each party's standard of living." *E.D.M. v. T.A.M.*, 307 S.C. 471, 476–77, 415 S.E.2d 812, 816 (1992). After finding an award is appropriate, the family court should next consider the amount of attorney's fees to award. *Farmer v. Farmer*, 388 S.C. 50, 57, 694 S.E.2d 47, 51 (Ct. App. 2010). In determining reasonable attorney's fees, the family court should consider: "(1) the nature, extent, and difficulty of the case; (2) the time necessarily devoted to the case; (3) professional standing of counsel; (4) contingency of compensation; (5) beneficial results obtained; [and] (6) customary legal fees for similar services." *Glasscock v. Glasscock*, 304 S.C. 158, 161, 403 S.E.2d 313, 315 (1991). "Ordinarily, unless otherwise provided for by contract or statute, the responsibility of paying attorney['s] fees falls upon the party contracting for the services." *Anderson v. Tolbert*, 322 S.C. 543, 545, 473 S.E.2d 456, 457 (Ct. App. 1996).

In its final order, the family court found Husband was entitled to recover his attorney's fees from Wife. Citing to *E.D.M.*, the family court determined: (1) both parties had the ability to pay their own attorney's fees, but Husband's debt "may" limit his ability; (2) Husband's attorney obtained more beneficial results, and Wife's position toward equitable division was unreasonable; (3) the parties would be in relatively equal financial conditions after the equitable division; and (4) Wife's standard of living would not be significantly affected by her payment of Husband's fee, but Husband's standard of living "could be" reduced if he had to pay his own fees. The family court then reviewed the *Glasscock* factors and determined Wife should pay all $27,561.29 of Husband's attorney's fees.

Reviewing the record de novo, we find a modification of the attorney's fees award is warranted. Although we are mindful of the family court's discretion in awarding attorney's fees, we conclude a more equitable apportionment is to require Wife to pay a portion—as opposed to the entirety—of Husband's attorney's fees. In modifying the family court's order, we emphasize that three of the four *E.D.M.* factors to consider in whether to award attorney's fees pertain to the financial positions of the parties.[1] *See E.D.M.*, 307 S.C. at 476–77, 415

---

1. Wife does not appeal the reasonableness of Husband's attorney's fees. Accordingly, we need not consider the factors enunciated in *Glasscock*

S.E.2d at 816 ("In determining whether an attorney's fee should be awarded, the following factors should be considered: (1) the party's ability to pay his/her own attorney's fee; (2) beneficial results obtained by the attorney; (3) the parties' respective financial conditions; [and] (4) effect of the attorney's fee on each party's standard of living.") Taking this into consideration, we note the financial equities between the parties. Husband and Wife both have the ability to pay their own attorney's fees, are in relatively equal financial positions following the family court's equitable distribution award, and can maintain their current standard of living if held responsible for their own attorney's fees. Further, although Husband was unemployed for a portion of the parties' marriage, his monthly income exceeded that of Wife by the date of the final hearing. We are cognizant of the family court's findings that Wife had no debt, possessed significant nonmarital properties, and had more time before retirement to acquire assets. However, we do not believe Wife's lack of debt should be used against her in the assessment of attorney's fees, particularly considering Husband's income and earning potential.

We recognize Husband achieved greater beneficial results than Wife. Husband successfully established the mobile home and his retirement account were nonmarital property and several pieces of real estate acquired during the marriage were marital property, despite Wife's claims they were acquired with her nonmarital funds. However, Wife successfully argued Messina Road was transmuted into marital property. Although we acknowledge Husband prevailed on more issues than Wife, the beneficial results factor is only one of several factors to consider in deciding whether or not to award attorney's fees. *See Wooten v. Wooten,* 358 S.C. 54, 65, 594 S.E.2d 854, 860 (Ct. App. 2003), *aff'd in relevant part, rev'd in part,* 364 S.C. 532, 615 S.E.2d 98 (2005) (holding "[e]ven though Husband prevailed on two of the equitable division issues in this appeal, the beneficial results obtained are only

pertaining to the reasonableness of attorney's fees. *See Simpson v. Simpson,* 377 S.C. 527, 539, 660 S.E.2d 278, 285 (Ct. App. 2008) (addressing only whether the wife was entitled to attorney's fees pursuant to *E.D.M.* and declining to address the reasonableness of attorney's fees when the husband only appealed the family court's ruling requiring him to pay half of the wife's attorney's fees).

one of several factors to be considered by the family court in deciding whether or not to award attorney's fees"). Further, although the family court declined to grant Wife a fault-based divorce, we find its decision to grant the parties a no-fault divorce should not work a detriment to Wife in the beneficial results analysis as neither ground would have dissolved the marriage any more completely. *See Mick–Skaggs*, 411 S.C. at 105, 766 S.E.2d at 876 (finding family court's decision to grant parties a no-fault divorce, despite the wife's claims of the husband's adultery, was neither beneficial nor harmful to either party in an *E.D.M.* analysis of whether to award attorney's fees).

Further, the family court briefly stated that "[t]he entries in [Husband's] fee affidavit indicated that discovery was resisted initially by [Wife] or her previous attorneys," but we find little evidence in the record that Wife was uncooperative or hindered litigation. Husband testified Wife resisted discovery and unnecessarily delayed the case; however, he submitted no proof that Wife's actions amounted to actual misconduct sufficient to warrant the imposition of all of Husband's attorney's fees against Wife. Accordingly, we find that requiring Wife to pay all of Husband's attorney's fees was improper. *Cf. Simpson*, 377 S.C. at 539–40, 660 S.E.2d at 285 (upholding fee award due to husband's lack of candor with the family court and his failure to fully cooperate throughout the litigation process); *Taylor v. Taylor*, 333 S.C. 209, 216–17, 508 S.E.2d 50, 54–55 (Ct. App. 1998) (finding the family court properly required husband to pay all of wife's attorney's fees when husband was overly litigious, uncooperative, and largely disorganized throughout the discovery and litigation process). Reiterating our de novo standard of review and the equities inherent in family court proceedings, we modify the family court's attorney's fees award and require Wife to contribute $15,000 toward Husband's attorney's fees.

## CONCLUSION

For the foregoing reasons, the family court's order is

**AFFIRMED AS MODIFIED.**

LOCKEMY, C.J., and MCDONALD, J., concur.